Filed 10/30/25  P. v. Dolce CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C100565 |
| Plaintiff and Respondent, | (Super. Ct. No. 22FE020104) |
| v. | |
| JAMES DOLCE, | |
| Defendant and Appellant. | |

A jury found defendant James Dolce guilty of one count of persuading another person to become a prostitute.  At trial, the prosecution introduced a series of text messages Dolce exchanged with an undercover police detective who was posing as a sex worker.  In one message, Dolce responded to a question about how he was making money by saying, "Weed."  On appeal, Dolce asserts that the trial court erred when it permitted this exchange into evidence, arguing that it should have been excluded under Evidence Code sections 1101, subdivision (a) and 352.[1]  He also contends that the court incorrectly failed to instruct the jury with CALCRIM No. 375, which would have limited

---

[1]  Undesignated statutory references are to the Evidence Code.

the purposes for which this evidence could be used.  We find no prejudicial error and affirm the judgment.

## BACKGROUND

The People charged Dolce with one count of persuading another person to become a prostitute.  (Pen. Code, § 266i, subd. (a)(2).)  As part of the prosecution case, the People introduced text messages between Dolce and Detective Jason Collins, who was posing as a sex worker named "Jaycee."

At trial, Detective Collins, an expert in pimping, pandering, and prostitution, explained the undercover operation that led to Dolce's apprehension.  Collins posted an advertisement for "in-calls," or appointments in which the sex buyer goes to the sex worker's location, and included a contact phone number.  Officer Trischelle Love posed for the pictures in the ad.  Dolce responded to the ad and initially asked "Jaycee" about her services.  Dolce referred to her as a "green ho," which Collins explained meant an inexperienced sex worker, and said she likely had a "simp," which Collins said meant a "weak or a fake pimp."  Dolce told "Jaycee" she needed "to get turned out on the blade, so you know how to do some real hoing," meaning that they should "go out on the blade, on the prostitution stroll, and do some real sex work."  Collins explained that these terms would not be used by a sex buyer and were more specific to the context of a conversation between a pimp and a sex worker.

"Jaycee" told Dolce that she was "flying solo," meaning she did not have a pimp. She told him that her "previous situation got hella weird" to explain why she did not have a pimp.  Dolce then told "Jaycee":  "My name is Clever.  I'm 49 and a white man.  I got lots of bread, and I'm looking for my other half, to take over the world."  Collins explained that the phrase "take over the world" was commonly used by pimps with sex workers to motivate them and meant that the pimp and sex worker could work together. "Jaycee" asked Dolce, "How many bitches you got?"  Dolce said, "None[.]  I only need one[.]  [S]he'll get more if that's what we [b]oth decide."  Dolce then said, "I use[d] to

2

have 3 bitches but I'm solo[,] getting my own bread," meaning that he was making his own money. "Jaycee" asked Dolce how he was making money, and Dolce replied, "Weed." She asked him if he had his "bitches work the blade or the net[,] too," by which she was asking whether he preferred his sex workers to reach sex buyers on the street or on the internet. Dolce replied, "No if she wants to work the track but if she is only wanting to work the lines then so be it," meaning that his sex workers could find buyers on the street, on the phone, or online.

Dolce said, "I'm wanting us to be a team," which was a typical way for a pimp to refer to his working relationship with a sex worker. "Jaycee" asked, "What would you offer me?" and Dolce responded, "Nobody can do it on their own. . . A better life, I have great credit, I have tons of game. . . Life is a two-way street. . . I'll put in what you put in." Collins read these messages as promises that Dolce would be able to provide "Jaycee" with financial security. "Jaycee" asked Dolce if he had "a fee," or a buy-in price to work for him, and Dolce replied, "Let's talk in person." The two discussed her location.

Dolce asked, "Do you have a P I need to serve," which Collins said meant that he was asking whether "Jaycee" had a pimp he would need to notify if he wanted her to work for him. Collins testified that this represented a "pretty advanced . . . level of knowledge of how this world works" and gave Collins "pretty much no doubt that this person was trying to recruit me." Dolce asked if she wanted a "dude" in her life; "Jaycee" asked if he would "take care" of her because her last pimp "took everything" from her. Dolce promised, "I'll always protect you." "Jaycee" said her last pimp "would leave me out there all on my own. Would u at least stay out there wit[h] me?" Dolce replied, "Yes." Collins explained that it would be common for a pimp to stay "within close vicinity" of his sex worker "in the name of protection and being available to help, if needed." "Jaycee" asked how many nights she would be working, and Dolce said, "We[']ll talk about that in person[,] it depends on our situation and schedule."

3

"Jaycee" said, "I will work for a P as long as you give me access to some money," and Dolce replied, "For sure. . . I have no issues with that. . . You need money to[o]. . . You need to look fly everyday." Collins said that this was typical of a pimp/sex worker working relationship, where the pimp would take the money earned by the sex worker and use some of it to buy clothes or other things to make the sex worker "look good." "Jaycee" asked whether she would "travel or anything or just stay local," to which Dolce responded, "Both travel and local. . . . I got lots of game. . . . I know lots of places we can get money." Collins testified that pimps would take sex workers to different locations because prostitution was a "very transitory crime." "Jaycee" asked whether Dolce was "good at talkin with the tricks? I hate talkin wit[h] these creeps," referring to a potential situation where Dolce would handle communications with sex buyers for her. Dolce said, "I've never talked to the trick but we can talk about it if that's what you want I'm down to make things easier for you." The two communicated about "Jaycee's" location.

When Dolce arrived at the hotel that "Jaycee" had identified, Officer Love met him in the lobby. He identified himself as "Clever" and told her that she "looked better in person than in [her] photos." Officers then detained Dolce and recovered four cell phones from his truck.

Detective Collins opined that Dolce had been using "language of recruitment" in his messages that was typical for messages between sex workers and pimps. He said that the language a sex buyer uses is different than the language a pimp would use. For example, a sex buyer would never mention "another pimp" or refer to a sex worker as a "ho." A sex buyer would also be unfamiliar with the recruitment terminology a pimp would use with a sex worker. A sex buyer would be unlikely to ask a sex worker about her pimp or whether she worked on the street.

Dolce testified in his defense. He denied that he was a pimp and said that he paid for sex with prostitutes a couple of times a month. He said that he was a "lonely person"

4

and was texting "Jaycee" because he was trying to "get a friend." Dolce was only "bragging" when he told "Jaycee" that he had "three bitches" working for him. He said that he had learned prostitution terminology through his interactions with sex workers. He asked about whether she had a pimp because he had had a bad experience where he was beat up when he showed up for an in-call visit. He claimed that he made money selling marijuana, running a bounce house business, buying and selling cars, and reselling items he bought from storage lockers. The cell phones from his truck were for his various businesses. He said that his text messages about making money and traveling meant that he wanted to make money through selling marijuana. He denied attempting to recruit "Jaycee" to be a sex worker for him.

The jury found Dolce guilty of persuading another person to become a prostitute. Dolce filed a timely notice of appeal.

## DISCUSSION

## I.

Dolce argues that the trial court erred when it allowed into evidence text messages saying that he earned money by selling marijuana.

## A.

Before trial, Dolce's counsel objected to the text exchange in which "Jaycee" asked how Dolce was making money and Dolce replied, "Weed." Defense counsel argued that the question and response were "prejudicial, uncharged misconduct." The prosecution argued that the information was relevant because it explained how Dolce was making a living from the time he employed sex workers until his messages with "Jaycee." The trial court noted that Dolce could be referring to legal marijuana sales but offered to redact the word "Weed" in the response. Defense counsel asked for the question to be redacted as well, and the court overruled the objection, saying, "Under [section] 352, I find that the relevance, the probative value is not substantially

5

outweighed by undue prejudice or confusing the issues.  It is relevant and probative to the case."  Collins testified about the text exchange during the trial.

Before Dolce testified, defense counsel asked the trial court to prohibit the prosecutor from asking Dolce about marijuana sales if he testified, arguing that it was uncharged misconduct.  The court agreed, saying that, although it was permissible to allow in the text messages to show that Dolce made money from selling marijuana, it would be unduly prejudicial to solicit further testimony about Dolce's marijuana activities, and also would not be admissible under section 1101, subdivision (b).  The court permitted the prosecutor to ask Dolce, "In your text message you said you sell weed.  Is that correct or not?"  If Dolce said "yes," that would be the end of that line of questioning, but if he replied "no," the prosecutor would be permitted to ask further questions on the topic.  Ultimately, the prosecutor asked Dolce whether the text message meant "that you make your money selling weed, right?"  Dolce answered, "Yes, ma'am."

B.

"[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."  (§ 1101, subd. (a).)  Acts of uncharged misconduct may be offered for noncharacter purposes, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident."  (§ 1101, subd. (b).)  Even if relevant for a noncharacter purpose, the evidence may be excluded under section 352 if its "probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  "We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under . . . sections 1101 and 352."  (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.)

6

The People argue that Dolce forfeited his current challenge to the admission of the text messages by failing to make an adequate objection below. They also argue that the trial court correctly admitted the messages. We conclude that, even assuming the claim is properly preserved and the trial court erred, any error was harmless.

The parties disagree about the applicable standard for measuring prejudice. Dolce asserts that the trial court's evidentiary error violated his federal constitutional due process rights and must therefore be evaluated under the standard enunciated in *Chapman v. California* (1967) 386 U.S. 18. The People argue that the standard from *People v. Watson* (1956) 46 Cal.2d 818 applies. We agree with the People.

"Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) Our Supreme Court has routinely assessed error under sections 1101 and 352 using the *Watson* standard. (*People v. Welch* (1999) 20 Cal.4th 701, 749-750 [§ 1101]; *People v. Alcala* (1992) 4 Cal.4th 742, 791 [§ 352].) And we see no indication in the record here that the People relied on the challenged evidence such that it made the trial fundamentally unfair. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1209.) We thus apply the *Watson* standard and assess whether it is "reasonably probable that a result more favorable to defendant would have resulted absent admission of this evidence." (*Welch*, at p. 750.)

The challenged text messages were only a minor part of the prosecution's case, which was otherwise very strong. The prosecution admitted an extensive series of text messages showing Dolce holding himself out as a pimp and making a variety of promises to "Jaycee" if she came to work for him as a sex worker. Among other things, he promised her protection and financial security. He discussed the "fee" for coming to work for him and "serving" her current pimp, which indicated a high level of knowledge about prostitution culture and was inconsistent with Dolce's testimony that he was merely a prospective sex buyer. Dolce also talked about specific work arrangements with "Jaycee," including travel plans, work schedules, and Dolce's ability to act as an

7

intermediary between "Jaycee" and sex buyers.  All of these statements indicated that Dolce was attempting to recruit "Jaycee" to work for him as a sex worker and had intent to do so.  (See *People v. Zambia* (2011) 51 Cal.4th 965, 980 [elements of persuading another person to become a prostitute].)

The evidence also was not particularly inflammatory.  As the trial court noted, it was not even clear if Dolce was referring to illegal, rather than legal, marijuana sales. Dolce attempted to use the evidence to his advantage as well, when he claimed that he only meant he wanted to sell marijuana with "Jaycee" in his messages about making money and traveling with her.  Because of the strength of the prosecution's case, there is no reasonable probability that, absent the two text messages, the jury would have reached a more favorable verdict.

## II.

Dolce next contends that the trial court erred when it failed to instruct the jury using CALCRIM No. 375, which would have directed the jury to use the evidence that Dolce earned money from selling marijuana for a limited purpose, such as intent or motive.

As with Dolce's evidentiary challenge, assuming that the issue was not forfeited and that the trial court erred, we see no prejudice.  Dolce again asserts that we should assess prejudice under the standard set forth in *Chapman v. California*, *supra*, 386 U.S. at page 18, for federal due process violations, while the People argue the applicable standard is stated in *People v. Watson*, *supra*, 46 Cal.2d at page 818.  The California Supreme Court has applied *Watson* in situations involving instructional error on the use of prior uncharged conduct evidence.  (*People v. Foster* (2010) 50 Cal.4th 1301, 1333; *People v. Falsetta* (1999) 21 Cal.4th 903, 924-925.)  And the cases Dolce cites to support the use of the *Chapman* standard involve instructional errors omitting the elements of crimes or defenses, rather than the application of state evidentiary law.  Accordingly, we will apply the *Watson* standard here and assess whether it is " ' "reasonably probable" '

8

that a result more favorable to the appealing party would have been reached in the absence of error." (*People v. Jandres* (2014) 226 Cal.App.4th 340, 360.)

As we explained above, the evidence of Dolce's guilt was substantial, and the evidence that he sold marijuana played only a minor role at trial. Because the evidence on its own was not significant, it is unlikely a limiting instruction would have improved Dolce's chances. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1054 [failure to give limiting instruction harmless where prior convictions were "not particularly inflammatory" and "it would have been obvious to the jury" that they "were not relevant to and, accordingly, could not be considered regarding, defendants' guilt"].) Any instructional error was harmless.

## III.

Finally, Dolce argues that his conviction should be reversed because of the combined effect of the two claimed errors. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to [the] defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.) " 'In examining a claim of cumulative error, the critical question is whether [the] defendant received due process and a fair trial.' " (*People v. Roberts* (2021) 65 Cal.App.5th 469, 482.) Here, there are only two alleged errors, both of which relate to the same evidentiary issue. To the extent we assumed error to address prejudice, "[t]he instructional and evidentiary errors were minor, especially in light of . . . the significant evidence of guilt, and they did not have 'negative synergistic effect[s].' " (*People v. Garton* (2018) 4 Cal.5th 485, 521; see also *People v. Williams*, *supra*, 170 Cal.App.4th at p. 646.) We thus conclude these errors do not demonstrate Dolce was deprived of due process and a fair trial.

## DISPOSITION

The judgment is affirmed.

/s/
FEINBERG, J.

We concur:

/s/
RENNER, Acting P. J.

/s/
KRAUSE, J.